UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

ALFREDO ROCA-MORENO, III,

                Plaintiff,

v.                                      Case No. 5:18-cv-231-BJD-PRL

FNU ROSSITER, et al.,

                Defendants.

_____

## **ORDER**

### **I. Status**

Plaintiff, Alfredo Roca-Moreno, III, an inmate of the Florida penal system, is proceeding on a second amended complaint (Doc. 36; Compl.) against six individuals: Warden S. Rossiter, Captain B.N. Crawford, then-Lieutenant J. Moore, then-Officer J. Mohs, Officer M. Geiger, and Officer E. Berg.[1] Before the Court is Defendants' motion for summary judgment (Doc. 66; Motion), which Plaintiff opposes (Doc. 83; Pl. Resp.). Defendants filed a reply (Doc. 90; Reply). Thus, the motion is ripe for this Court's review.

---

[1] Defendant Berg's last name is spelled incorrectly in Plaintiff's complaint and, therefore, on the Court's docket. The Court will use the correct spelling in this Order.

## II. Summary Judgment Standard

Under Rule 56 of the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the nonmovant. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (quoting Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 919 (11th Cir. 1993)). "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). The record to be considered on a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).

When the moving party has discharged its burden, the non-moving party must point to evidence in the record to demonstrate a genuine dispute of material fact. Id. Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248. In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing [the motion]." Haves v. City of Miami, 52 F.3d 918, 921 (11th Cir. 1995) (citing Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro, 38 F.3d 1571, 1578 (11th Cir. 1994)).

### III. Complaint Allegations[2]

The conduct of which Plaintiff complains occurred on December 18, 2017, at Marion Correctional Institution (MCI). Plaintiff alleges Defendants Crawford, Moore, Berg, Geiger, and Mohs, at separate times but during the same overall interaction, used excessive force against him. See Compl. at 13-15. The first alleged incident occurred in the laundry room and involved Defendants Crawford, Moore, and Berg. Id. at 7. Plaintiff alleges he entered the laundry room with Officer Franklin (not a Defendant), with whom he had

---

[2] A plaintiff's allegations in his verified complaint are to be given the same weight as an affidavit. See Stallworth v. Tyson, 578 F. App'x 948, 950 (11th Cir. 2014).

a verbal disagreement about personal items he was carrying. Id. at 7-8. According to Plaintiff, shortly after he entered the laundry room, Defendants Crawford, Moore, and Berg entered and "rushed [Plaintiff] yelling cuff up." Id. at 8. Plaintiff states under penalty of perjury, "I made it a point to be submissive place [sic] my hand behind my back [sic] turn around." Id. Plaintiff pleaded with the officers to be careful with him because he had a laceration on his forehead that needed stitches. Id. Plaintiff asserts Defendants "purposely ignored [him] and . . . tackled [him] to the floor head first." Id. at 9.

Plaintiff further asserts these three Defendants "rough[ed] [him] up on the floor" for a few minutes before placing him in restraints. Id. Plaintiff alleges the impact caused the laceration on his forehead to open and bleed so much that it "create[d] a puddle." Id. He also says the impact caused him to become dizzy, disoriented, and lightheaded. Id. Plaintiff alleges officers placed a spit shield over his face "to contain the blood," id., but it was "maliciously" placed incorrectly, obstructing his breathing and vision, id. at 10. He says the blood pooled inside the spit shield, causing him to choke on it. Id.

Plaintiff alleges the other two officer-Defendants then "arrived with a hand-held camera and to assist." Id. These two Defendants—Geiger and Mohs—were involved in the second alleged use-of-force incident, which occurred outside on the way to the medical unit. Id. Because of the spit shield's

placement, Plaintiff could not see who was doing or saying what, but he alleges officers were "jeering at [him] [and] making threats [sic] punching and shoving [him] harshly," while they were escorting him to the medical unit. Id. at 10-11. Plaintiff asserts the following occurred: "One of the officers grabbed the back of my head and maliciously slammed me on the concrete ground then another officer rested one knee on the side of my head putting all his body weight crushing my skull." Id. at 11. He says the impact knocked him unconscious and, when he gained consciousness, he started screaming "in pain and horror." Id. Plaintiff alleges the nurse who assessed him reproached the officers for misplacing the spit shield. Id.

Plaintiff alleges the officers falsified disciplinary reports against him, saying he "tried to spit on staff" to justify their use of the spit shield and their alleged abuse. Id. at 12. Plaintiff asserts the alleged abuse he experienced "is widespread persistent [sic] unchecked practice custom and policy," which is the basis for his claim against Defendant Rossiter, then-Warden of MCI. Id. at 12-13. Plaintiff asserts claims under the Eighth Amendment and state law (assault and battery and intentional infliction of emotional distress). Id. at 7. He seeks compensatory and punitive damages. Id. at 13-15.

# IV. Motion

As to the constitutional claims, Defendants invoke qualified immunity. <u>See</u> Motion at 25. In accordance with a qualified-immunity analysis, the officer-Defendants assert there is no evidence they used excessive force against Plaintiff but rather applied the necessary amount of force to restore order and gain Plaintiff's compliance. <u>Id.</u> at 26. Defendants further argue there is no evidence to support a claim against Defendant Rossiter under a theory of supervisory liability, and Plaintiff's claims are <u>Heck</u>[3]-barred because Plaintiff incurred two disciplinary charges arising out of the incident, which were not overturned. <u>Id.</u> at 20, 22. Finally, and alternatively, Defendants assert Plaintiff, if successful, can recover only nominal damages because any injuries he sustained were <u>de</u> <u>minimis</u>. <u>Id.</u> at 26. As to the state-law claims, Defendants invoke sovereign immunity and argue those claims fail on their merits. <u>Id.</u> at 23-24.

# V. Evidence

In support of their motion, Defendants offer use-of-force and incident reports, medical records, affidavits and a declaration, disciplinary reports, video footage (filed under seal), and discovery documents (Docs. 66-2 through 66-21 and Doc. 72-1; Def. Exs. A-T). With his response, Plaintiff offers his own

---

[3] <u>Heck v. Humphrey</u>, 512 U.S. 477 (1994).

declaration (Docs. 84; Pl. Dec.) and exhibits (Doc. 87; Pl. Ex.), including medical records, photographs, and copies of Defendants' discovery responses.

The alleged use-of-force incidents occurred within minutes of each other. The first incident happened in the G-dorm laundry room after Officer Franklin called Defendants Crawford, Moore, and Berg to assist with a "disorderly inmate." See Def. Ex. E ¶ 3; Def. Ex. F ¶ 3; Def. Ex. H ¶ 3. In the moments before Officer Franklin called Defendants Crawford, Moore, and Berg to assist her, Plaintiff was walking to his dorm to drop off his just-purchased canteen items and then was headed to a medical appointment for stitches to close the laceration on his forehead. See Pl. Dec. ¶ 1; Pl. Ex. at 5, 8.

Plaintiff avers Officer Franklin stopped him "for no apparent reason," demanding his canteen items. See Pl. Dec. ¶ 2. Plaintiff concedes he refused to comply with Officer Franklin's request. Id. See also Pl. Resp. at 8. At Officer Franklin's command, Plaintiff entered the laundry room. See Pl. Dec. ¶ 6. Plaintiff avers Defendants Crawford, Moore, and Berg arrived "soon after" he entered the laundry room, and he tried to explain to them what happened, but instead of listening to him, they "rushed [him] yelling cuff up." Id. ¶ 7.

The fixed-wing camera footage, which provides no audio, shows Plaintiff and Officer Franklin enter the laundry room from outside at about 13:50:09. See Def. Ex. P. Plaintiff exits after about thirty seconds but comes back in at

13:51:10, and Officer Franklin eventually closes and locks the door behind him. Id. Plaintiff is not restrained. He is holding something in his left arm, close to his body. Id. Based on his body language, it appears Plaintiff is arguing with Officer Franklin about what he is carrying, which looks to be items inside a blue cap. Id.

Plaintiff and Officer Franklin engage in conversation for just over one minute. During that time, Plaintiff appears agitated and argumentative: He paces and gestures expressively. Id. At one point, Officer Franklin taps a table near her in a manner suggesting she is directing him to place his items on the table. Plaintiff looks as if he is about to comply. He walks to the table and almost puts his bundle on it. Id. But then he changes his mind and continues arguing with Officer Franklin. Id. Officer Franklin exits the door closest to the camera at about 13:52:37, and, about two seconds later, Defendants Crawford and Moore enter through a door at the opposite end of the room—the one through which Plaintiff and Officer Franklin entered and which leads directly outside. Id.

Contrary to Plaintiff's description, Defendants Crawford and Moore do not "rush" at him. They walk inside and stop a few feet from Plaintiff. Id. Defendant Crawford holds her left hand up toward Plaintiff in what appears to be a "stop talking" or "don't move" gesture, and then reaches for her

handcuffs. Defendant Moore extends her hand and walks toward Plaintiff. <u>Id.</u> These actions are consistent with Defendants Crawford's and Moore's assertions that they "ordered [Plaintiff] to hand over what he was holding" and submit to hand restraints. <u>See</u> Def. Ex. E ¶ 3; Def. Ex. F ¶ 3. As Defendant Crawford pulls out her hand cuffs and Defendant Moore walks closer to Plaintiff, Defendant Berg enters the room. <u>See</u> Def. Ex. P.

Despite three officers attempting to restrain Plaintiff, he partially turns away from them and appears to tuck the cap under his arm. <u>Id.</u> Defendants Crawford and Moore grab Plaintiff by his arms and place him against the opposite wall (which looks to be about three to five feet away). <u>Id.</u> Defendants Crawford, Moore, and Berg surround Plaintiff. Thus, it becomes difficult to see him, but after a few seconds, his head suddenly lowers in a forward motion, suggesting he is trying to pull away. <u>Id.</u> Defendants aver Plaintiff "continued to physically resist [their] commands," so they had to take him to the ground. <u>See</u> Def. Ex. E ¶ 3; Def. Ex. F ¶ 3; Def. Ex. H ¶ 3. They explain that Defendant Crawford grabbed Plaintiff's left arm, Defendant Moore grabbed his right, and Defendant Berg pulled Plaintiff's legs outward. <u>See</u> Def. Ex. E ¶ 3; Def. Ex. F ¶ 3; Def. Ex. H ¶ 3. <u>See also</u> Def. Ex. B at 1, 3, 5.

The video footage shows Plaintiff's whole body is in the air at one point because the officers are grabbing his extremities at the same time. <u>See</u> Def. Ex.

P. His face hits the ground first. Id. After Plaintiff is on the ground, it is difficult to see anything else because the officers are surrounding him, including Officer Franklin, who returned to the room. Additionally, Plaintiff is lying in front of the open door, which is at the opposite end of the room from the camera, and sunlight is flooding in, creating a bit of a blind spot at times. Id. Defendants Crawford, Moore, and Berg aver that Plaintiff attempted to bite Moore's right hand when they had him on the floor. See Def. Ex. E ¶ 3; Def. Ex. F ¶ 3; Def. Ex. H ¶ 3. Plaintiff denies having tried to bite Defendant Moore. See Pl. Dec. ¶¶ 12, 13, 16.

Defendants Geiger and Mohs arrive about one minute after Plaintiff is brought to the floor. See Def. Ex. P. Neither one of them is operating a hand-held camera. Instead, they relieve Defendants Moore and Berg and prepare to take Plaintiff to the medical unit. All officer-Defendants commonly aver that Plaintiff "spat towards staff" at approximately 1:55 p.m., which prompted Defendant Mohs to "control [Plaintiff's] head in order to prevent staff battery."[4] See Def. Ex. E ¶ 3; Def. Ex. F ¶ 3; Def. Ex. G ¶ 3; Def. Ex. H ¶ 3; Def. Ex. I ¶ 3.

---

[4] Upon review of the video, Plaintiff's head can be seen lifted off the floor between 13:54:54 and 13:55:30, at which time Defendant Mohs suddenly pushes Plaintiff's head to the floor. See Def. Ex. P. Plaintiff denies having spit. See Pl. Dec. ¶¶ 12, 13, 16. But, in his response and supporting declaration, he clarifies that his claim against Defendant Mohs is based on the incident that occurred outside—not in the laundry room. See Pl. Resp. at 1, 4; Pl. Dec. ¶ 9.

At 13:59:30, Defendant Geiger places a spit shield over Plaintiff's head while Plaintiff is still lying face-down on the floor. <u>See</u> Def. Ex. P. Defendants Mohs and Geiger then lift Plaintiff off the floor and escort him out of the laundry room. <u>Id.</u>

The hand-held video begins at about 2:00 p.m., according to the camera operator, Sergeant Thomas Johnson. <u>See</u> Def. Ex. O; Def. Ex. B at 11. Sergeant Johnson is walking behind Plaintiff, who is fully shackled, wearing a spit shield, and being escorted by Defendants Mohs and Geiger. <u>See</u> Def. Ex. O. Within seconds of Sergeant Johnson starting to record, Defendants Mohs and Geiger suddenly force Plaintiff to the concrete sidewalk face-first. <u>Id.</u> After about forty seconds, Defendants Geiger and Mohs lift Plaintiff off the ground and they take him to the medical unit. <u>Id.</u>

In their affidavits, Defendants Geiger and Mohs aver that Plaintiff actively resisted them during escort and "continuously spat" toward Defendant Mohs, which necessitated their use-of-force. <u>See</u> Def. Ex. G ¶ 3; Def. Ex. I ¶ 3. Defendant Mohs avers, "I ordered [Plaintiff] to cease his behavior to which [Plaintiff] turned and spat in my direction, striking the front of my shirt with his saliva." <u>See</u> Def. Ex. G ¶ 3. Defendants aver they "readjusted [Plaintiff's] spit shield" when he was on the ground. <u>Id.</u> <u>See also</u> Def. Ex. I ¶ 3. According

to Defendants, Plaintiff remained "physically combative during the remainder of the escort." <u>See</u> Def. Ex. G ¶ 3; Def. Ex. I ¶ 3.

Plaintiff incurred two disciplinary charges for his conduct on December 18, 2017: one for battery on an officer and one for disobeying an officer's order. <u>See</u> Def. Ex. M at 1; Def. Ex. N at 1. As to the former, Defendant Mohs reported that Plaintiff spit at him during escort. <u>See</u> Def. Ex. M at 1. As to the latter, Defendant Moore reported that Plaintiff refused her order to hand over his personal items and submit to hand restraints. <u>See</u> Def. Ex. N at 1. Plaintiff pled guilty to the latter charge and was adjudicated guilty of the former. <u>See</u> Def. Ex. M at 1; Def. Ex. N at 1. In his declaration, Plaintiff staunchly denies having spat at the officers. <u>See</u> Pl. Dec. ¶¶ 12, 13, 16. Upon review of the video footage, it is unclear whether Plaintiff spat at Defendant Mohs because Sergeant Johnson is filming from behind them. <u>See</u> Def. Ex. O.

## VI. Analysis & Conclusions

### A. <u>Heck</u> Bar

Defendants contend Plaintiff's use-of-force claims are <u>Heck</u>-barred because he incurred disciplinary charges that resulted in the loss of gain time and were not overturned. <u>See</u> Motion at 22. Plaintiff responds that he does not seek reinstatement of the lost gain time, nor does he seek monetary damages for having incurred disciplinary charges. <u>See</u> Pl. Resp. at 9, 10.

The Supreme Court in <u>Heck</u> held a state prisoner's claim for damages "is not cognizable under § 1983 . . . . [if] a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence." 512 U.S. at 487. The Supreme Court later expanded the <u>Heck</u> bar to a prisoner's challenge to disciplinary proceedings. <u>See</u> <u>Edwards v. Balisok</u>, 520 U.S. 641, 643 (1997). In <u>Balisok</u>, the Court held a prisoner's claim "for declaratory relief and money damages, based on allegations of deceit and bias on the part of the decisionmaker that necessarily imply the invalidity of the punishment imposed, is not cognizable under § 1983." <u>Id.</u> at 648.

A prisoner need not seek monetary damages or the reinstatement of good time credits for <u>Heck</u> to apply; the test is whether a civil judgment in the prisoner's favor would necessarily negate the underlying punishment. <u>See</u> <u>Hughes v. Lott</u>, 350 F.3d 1157, 1160 (11th Cir. 2003). <u>See also</u> <u>Okoro v. Callaghan</u>, 324 F.3d 488, 490 (7th Cir. 2003) ("It is irrelevant that [the prisoner] disclaims any intention of challenging his conviction; if he makes allegations that are inconsistent with the conviction's having been valid, <u>Heck</u> kicks in and bars his civil suit.").

Regardless of the precise relief sought, the <u>Heck</u> bar does not automatically apply in a civil case that arises out of an incident for which the prisoner incurred disciplinary charges. <u>See</u> <u>Roberts v. Wilson</u>, 259 F. App'x

226, 228 (11th Cir. 2007). In fact, the Eleventh Circuit has acknowledged it is "possible for an excessive-force action and a battery action to coexist without running afoul of <u>Heck</u>." <u>Dixon v. Hodges</u>, 887 F. 3d 1235, 1238, 1239 (11th Cir. 2018) (holding <u>Heck</u> did not apply because whether the plaintiff lunged at the officer, as was found at his disciplinary proceeding, was not crucial to the success of his civil action). For instance, "When a plaintiff alleges a fact that, if true, would conflict with the earlier punishment, but that fact is not necessary to the success of his § 1983 suit, the <u>Heck</u> bar does not apply." <u>Harrigan v. Metro Dade Police Dep't Station #4</u>, 977 F.3d 1185, 1196 (11th Cir. 2020).

On the other hand, if a plaintiff alleges facts that are necessary to the success of his civil action but inconsistent with those supporting his disciplinary conviction, his claim may not proceed absent proof that the disciplinary conviction was expunged or overturned. <u>See</u> <u>Dixon</u>, 887 F. 3d at 1239. <u>See also</u> <u>Richards v. Dickens</u>, 411 F. App'x 276, 278-79 (11th Cir. 2011). In <u>Richards</u>, the court held the plaintiff's civil action was <u>Heck</u>-barred because the primary facts supporting his claim contradicted the facts supporting the disciplinary charges against him. <u>Id.</u> at 278. In support of his excessive force claim, the prisoner argued that he acted in self-defense, while the officers

attested in support of the disciplinary actions against him that he assaulted them (the officers). Id. at 277.

Defendants argue Heck applies to both use-of-force incidents, though they do not address the incidents separately. Each incident must be analyzed separately, however, because the inconsistent-factual-allegations theory is fact-specific. That is, whether a civil claim is Heck-barred depends on an analysis of the facts a plaintiff must prove to win his civil action and the facts that supported the disciplinary charge against him.

The laundry room incident presents a classic example of when an excessive-force action and a disciplinary action may co-exist without running afoul of Heck. Plaintiff was charged with, and pled guilty to, disobeying an order. See Def. Ex. N at 1. Plaintiff's allegation that Defendants Crawford, Moore, and Berg used excessive force against him after he admittedly disobeyed an order does not necessarily contradict the facts supporting the disciplinary charge, which are as follows, as written by Defendant Moore:

> I observed inmate Roca-Moreno . . . concealing something in his arms. I ordered inmate Roca-Moreno to hand me what he was holding to which he refused. I then ordered inmate Roca-Moreno to turn around and submit to restraints to which he again refused my order. It then became necessary to use physical force to bring inmate Roca-Moreno in compliance with my orders and place him in restraints.

Id. It is possible that Plaintiff disobeyed Defendant Moore's order and that Defendants Moore, Crawford, or Berg, or all three, used more force than necessary to gain Plaintiff's compliance. The facts are not logically inconsistent or contradictory. Not only are the facts not contradictory, they are nearly the same. Plaintiff concedes he disobeyed a verbal order, see Pl. Resp. at 8, and, in fact, he pled guilty to that disciplinary charge, see Def. Ex. N at 1. And Defendants Crawford, Moore, and Berg concede they used physical force to gain Plaintiff's compliance. What the parties dispute is whether the nature and amount of force used was reasonable under the circumstances.

The same is true as to the excessive force claim against Defendants Geiger and Mohs. The disciplinary team found Plaintiff guilty of battery based on the following circumstances:

> Officer Mohs and Officer Geiger were responding to [an] incident and as they were escorting inmate Roca-Moreno to confinement, the inmate was continuously spitting. Officer Mohs ordered the inmate to cease, and inmate Roca-Moreno turned and spit in his direction striking the front of his shirt. Officer Mohs had to force the inmate to the ground to prevent him from making any further attempts of spitting at or on him.

See Def. Ex. M at 2, 3. In his complaint, Plaintiff alleges Defendant Geiger or Mohs maliciously misplaced the spit shield, ignored his pleas to fix the spit shield so he could breathe, slammed him so hard to the concrete that he was knocked unconscious, and used force against him while he was on the ground

by placing a "knee on the side of [his] head . . . crushing [his] skull." <u>See</u> Compl. at 11.[5] In his response, Plaintiff says, "[Defendants Geiger and Mohs] grabbed my head and slammed me against the concrete." <u>See</u> Pl. Dec. ¶ 10; Pl. Resp. at 1, 4. Plaintiff asserts the use-of-force left a large hematoma on his forehead. <u>See</u> Pl. Resp. at 1, 4. Significantly, Plaintiff denies having spit at the officers. <u>See</u> Pl. Dec. ¶¶ 12, 13, 16. Thus, he suggests they had no reason to slam him to the ground.

On summary judgment, the Court must accept Plaintiff's allegations as true. Accepting as true that Plaintiff did not spit at Defendants Geiger or Mohs during escort would appear to contradict the facts supporting the disciplinary charge against him. However, it is plausible that Defendants thought Plaintiff was purposely spitting at them when in fact, he may have been expelling saliva while struggling to breathe or "choking on [his] own blood," as he claims. <u>See</u> Compl. at 10; Pl. Dec. ¶ 9; Pl. Resp. at 4.

Moreover, Plaintiff does not necessarily have to prove he did not spit at Defendant Mohs to succeed on his claim. Plaintiff alleges Defendants' response

---

[5] In his complaint, Plaintiff also alleges officers punched and shoved him while being escorted from the laundry room to the medical unit. <u>See</u> Compl. at 11. He does not allege which officers punched and shoved him, but he appears to have abandoned these allegations because he does not mention them in his response or his declaration. <u>See</u> Pl. Resp. at 1, 4; Pl. Dec. ¶ 9. Regardless, the video evidence blatantly contradicts these allegations. <u>See</u> Def. Ex. O.

to his alleged spitting was excessive because they "slammed [him] head first to the concrete," causing him to lose consciousness momentarily; used force against him after slamming him to the ground by placing a knee on his head; and knew the spit shield was not placed correctly, causing Plaintiff to struggle to breathe. See Compl. at 11; Pl. Resp. at 4; Pl. Dec. ¶ 9. Plaintiff theoretically could prove such allegations even had he spit at Defendant Mohs (and assuming the evidence would support such allegations).

For the reasons stated, Heck does not bar Plaintiff's excessive force claims against Defendants Crawford, Moore, Berg, Geiger, and Mohs.

## B. Qualified Immunity

Defendants Crawford, Moore, Berg, Geiger, and Mohs invoke qualified immunity, arguing they were performing discretionary functions and did not violate a clearly established constitutional right. See Motion at 25-26. As to the laundry room incident, Plaintiff asserts, once the officers "had him against the wall . . . they had him under control," so there was no need to take him to the floor. See Pl. Resp. at 5. As to the incident outside, Plaintiff contends Defendants Geiger and Mohs "slammed" him to the ground with such force that he lost consciousness and developed a large hematoma on his forehead. Id. at 4, 5.

Prison officials sued in their individual capacities are "entitled to qualified immunity for [their] discretionary actions unless [they] violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" Black v. Wigington, 811 F.3d 1259, 1266 (11th Cir. 2016) (quoting Case v. Eslinger, 555 F.3d 1317, 1325 (11th Cir. 2009)). Qualified immunity allows government employees to exercise their official duties without fear of facing personal liability. Alcocer v. Mills, 906 F.3d 944, 951 (11th Cir. 2018). The doctrine protects all but the plainly incompetent or those who knowingly violate an inmate's constitutional rights. Id. In other words, even if a prison official makes a decision that is later found to be constitutionally deficient, the official is entitled to qualified immunity if the decision was based on a reasonable misapprehension of the law governing the circumstances. Taylor v. Riojas, 141 S. Ct. 52, 53 (2020) (citing Brosseau v. Haugen, 543 U.S. 194, 198 (2004)).

Upon invoking qualified immunity, a defendant bears the initial burden to demonstrate he or she was performing discretionary duties at the relevant times. Id. Plaintiff does not dispute that Defendants were acting within the scope of their discretionary duties as corrections officers when the incidents occurred. As such, the burden shifts to Plaintiff, who must point to facts that,

accepted as true, demonstrate Defendants violated a constitutional right that was clearly established at the time. Id.

The Eighth Amendment "prohibits the unnecessary and wanton infliction of pain, or the infliction of pain totally without penological justification." Ort v. White, 813 F.2d 318, 321 (11th Cir. 1987). At the same time, it is well understood that prison guards, who are charged with maintaining order and protecting inmates and staff, may use force when necessary "to maintain or restore discipline." Whitley v. Albers, 475 U.S. 312, 320 (1986). See also Williams v. Burton, 943 F.2d 1572, 1575 (11th Cir. 1991). Accordingly, courts must balance concerns of an inmate's right to be free from cruel and unusual punishment with a prison official's obligation to ensure a safe and secure institution. Ort, 813 F.2d at 321-22.

An inmate against whom force is used to restore order demonstrates an Eighth Amendment violation "only if the measure taken 'inflicted unnecessary and wanton pain and suffering' caused by force used 'maliciously and sadistically for the very purpose of causing harm.'" Williams, 943 F.2d at 1575 (emphasis is original). "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." Hudson v. McMillian, 503 U.S. 1, 9 (1992).

Whether an officer used more force than necessary to quell a disturbance or regain control of a prisoner requires courts to consider various factors, including the need for force, the extent of force used in relation to the prisoner's conduct, the threat of harm the prisoner posed to staff and inmates, whether the officer tried to "temper the severity of a forceful response," and the injuries inflicted. See id.; Whitley, 475 U.S. at 321. See also Skrtich v. Thornton, 280 F.3d 1295, 1300 (11th Cir. 2002). In considering these factors, courts should "give a wide range of deference to prison officials acting to preserve discipline and security." Cockrell v. Sparks, 510 F.3d 1307, 1311 (11th Cir. 2007) (quoting Bennett v. Parker, 898 F.2d 1530, 1533 (11th Cir.1990)). The Supreme Court has stressed,

> [C]ourts must determine whether the evidence goes beyond a mere dispute over the reasonableness of a particular use of force or the existence of arguably superior alternatives. Unless it appears that the evidence, viewed in the light most favorable to the plaintiff, will support a reliable inference of wantonness in the infliction of pain under the standard we have described, the case should not go to the jury.

Whitley, 475 U.S. at 322 (emphasis added). Nonetheless, if an officer reasonably uses force to quell a disturbance, the force should cease once the behavior giving rise to the need for force abates. Ort, 813 F.2d at 324.

"Because § 1983 'requires proof of an affirmative causal connection between the official's acts or omissions and the alleged constitutional deprivation,' each defendant is entitled to an independent qualified-immunity analysis as it relates to his or her actions and omissions." <u>Alcocer</u>, 906 F.3d at 951 (quoting <u>Zatler v. Wainwright</u>, 802 F.2d 397, 401 (11th Cir. 1986) (per curiam)). As such, the Court will analyze the two incidents separately.

### i. Laundry Room Incident: Defendants Crawford, Moore & Berg

Plaintiff appears to acknowledge Defendants Crawford, Moore, and Berg were entitled to use some force against him given he disobeyed verbal orders. <u>See</u> Pl. Resp. at 3-4, 8. Plaintiff merely takes issue with the type and extent of force Defendants Crawford, Moore, and Berg used. For instance, Plaintiff faults Defendants Crawford, Moore, and Berg for not using alternative methods to approach him, such as attempting to "talk first" or using chemical agents instead of physical force. <u>Id.</u> at 3-4, 6. Additionally, Plaintiff contends he was not concealing anything because the items he was holding were inside "a blue mesh canteen bag"; he was trying to explain the situation to the officers but they instead "rushed [him] with malicious and ill intentions"; the officers had him "under control" when they "had him against the wall," so there was no need to bring him to the floor; and he posed no threat to the officers, whom he describes as being bigger than him. <u>Id.</u> at 3-6.

The fixed-wing video footage blatantly contradicts Plaintiff's characterization of Defendants Crawford's, Moore's, and Berg's entry into the laundry room. The officers did not "rush" at Plaintiff, as he asserts. Defendants Crawford and Moore, who arrived just moments before Defendant Berg, walked toward Plaintiff, and their body language suggests they ordered him to hand over the items in his hand and submit to restraints. See Def. Ex. P. Plaintiff did not comply, which he readily concedes. In his declaration, Plaintiff avers as follows: "I did plead[] guilty to the D.R. that [Defendant] Moore wrote me because I did [not] give her the canteen items that I purchased. I admitted to that because I did that." See Pl. Dec. ¶ 16.

Given Plaintiff refused to comply with Defendants Moore's and Crawford's commands after having refused to comply with Officer Franklin's commands, Defendants Crawford and Moore had reason to use force to gain Plaintiff's compliance. Defendant Berg did not use force against Plaintiff until it became necessary to force Plaintiff to the floor because Plaintiff "continued to physically resist commands." See Def. Ex. H ¶ 3. Under the circumstances and construing the facts in the light most favorable to Plaintiff, the first factor—the need for force—favors Defendants.

While Plaintiff quibbles with Defendants' choice to use physical force as opposed to spraying him with chemical agents, the extent of force was minimal.

Defendants Crawford and Moore initially grabbed Plaintiff's arms and pushed him up against the wall to handcuff him. They and Defendant Berg only wrestled Plaintiff to the floor because "[Plaintiff] continued to resist [their] commands to submit to hand restraints." See Def. Ex. E ¶ 3; see also Def. Ex. F ¶ 3; Def. Ex. H ¶ 3. Plaintiff's own description of the incident confirms that he was not being compliant. He avers Defendants Crawford, Moore, and Berg pulled him from one side of the room to the other and placed him against the wall, "hitting [his] upper torso and head against the left wall and wrestling [him] to the ground all the while [he] was trying to show them and explain the [sic] that [he] had a 1:30 pm pass to get [stitches]." See Pl. Dec. ¶ 7.[6]

That Plaintiff's head hit the floor first does not suggest Defendants acted with malice. On the contrary, they used force to gain Plaintiff's compliance. The Court defers to their split-second decision to use force to restrain Plaintiff, who admittedly disobeyed verbal orders. Additionally, Plaintiff offers no evidence to show Defendants Crawford, Moore, or Berg "rough[ed] [him] up on the floor," see Compl. at 9, nor does he explain or support these conclusory allegations in his response or declaration. For these reasons, the second factor—extent of force—favors Defendants.

---

[6] Plaintiff mistakenly numbered two paragraphs in his declaration as seven. This reference is to the first one.

The third factor also favors Defendants because, from their perspective, Plaintiff posed a threat of harm by actively trying to conceal items. In his response, Plaintiff contends Defendants could see what he was holding because the items were inside a mesh bag. See Pl. Resp. at 3. The video footage, however, shows Plaintiff was carrying items in what appears to be a blue hat, which was not see-through. Defendants Crawford and Moore were summoned to the laundry room because Plaintiff was being disorderly and when they entered the room, Plaintiff refused to hand over the items. Accepting that Plaintiff is smaller in stature than Defendants Crawford and Moore, the Court will not second-guess their split-second judgment that Plaintiff posed a threat of harm to himself or others.

The last two factors favor Defendants as well. The only injury Plaintiff claims to have sustained during this incident is the re-opening of a laceration that already needed stitches. See Pl. Dec. ¶ 7. The fact that Plaintiff sustained no other injuries from having been brought to the floor by three officers who are larger than him suggests the officers used a minimal amount of force. Additionally, Defendants Crawford and Moore aver, and the video footage shows, they attempted to handcuff Plaintiff when they had him against the wall, but they were forced to take Plaintiff to the floor when he refused to comply. See Def. Ex. E ¶ 3; Def. Ex. F ¶ 3; Def. Ex. P.

Defendants' attempts to temper the severity of their response is also demonstrated by the fact that they ceased all force after Plaintiff was fully restrained, and they escorted Plaintiff to the medical unit when it was safe for them to do so. See Ledlow v. Givens, 500 F. App'x 910, 913 (11th Cir. 2012) ("The immediate offer of medical assistance demonstrates an effort to temper the severity of the response.").

Viewing the facts in the light most favorable to Plaintiff, he fails to show the evidence "goes beyond a mere dispute over the reasonableness of the force used." See Brown v. Smith, 813 F.2d 1187, 1188 (11th Cir. 1987) (affirming summary judgment in favor of a prison guard who admittedly "placed his riot baton against [the prisoner's] neck with some degree of force" after the prisoner disobeyed an order). Accordingly, Defendants Crawford, Moore, and Berg are entitled to qualified immunity.

### ii. Outside Incident: Defendants Geiger & Mohs

As with the laundry room incident, Plaintiff's description of Defendants Geiger's and Mohs's use-of-force is somewhat contradicted by the video footage. First, neither officer "grabbed [Plaintiff's] head." Compare Pl. Dec. ¶ 9, with Def. Ex. O. Additionally, neither of them placed a knee on Plaintiff's head when he was lying on the ground. Compare Compl. at 11, with Def. Ex. O. Applying the factors, there was a need to use force because Defendants Geiger and Mohs

believed Plaintiff had spit at one or both of them; the use of force was minimal; Plaintiff demonstrated through his prior conduct (in the laundry room) that he posed a threat to himself and others; once Defendants regained control over Plaintiff, all force ceased; and Plaintiff sustained only a minimal injury (a hematoma).[7]

While Plaintiff denies having spit at Defendant Mohs, Defendants aver they thought he had, see Def. Ex. G ¶ 3; Def. Ex. I ¶ 3, and Defendant Mohs's shirt, a picture of which the parties provide as an exhibit, had a wet spot on the front afterward, see Def. Ex. M at 15-16; Pl. Ex. at 15-16. However, even if Plaintiff did not spit at Defendants, the video footage shows the type of force Defendants Geiger and Mohs used was minimal and not "of a sort repugnant to the conscience of mankind." See Hudson, 503 U.S. at 10 (quoting Whitley, 475 U.S. at 327). See also Burke v. Bowns, 653 F. App'x 683, 697 (11th Cir. 2016) (per curiam) (holding an officer's use of force was minimal where the officer, who thought the prisoner spit on him, slammed the fully shackled prisoner face-first to the ground and "pinned [the prisoner down] . . . using an 'arm bar' hold," causing only mild swelling and redness to the prisoner's face).

---

[7] In response to Defendants' interrogatories, Plaintiff wrote Defendants should consult his medical records for a description of the injuries he claims to have sustained from the December 18, 2017 incidents. See Def. Ex. T at 3. The medical records show Plaintiff had a "large hematoma on [right] side of forehead." See Def. Ex. D, Part 2, at 85, 88.

Moreover, accepting as true that Plaintiff lost consciousness when his head hit the concrete, the evidence does not permit the inference that Defendants Geiger and Mohs used force maliciously and sadistically for the very purpose of causing harm. See Cockrell, 510 F.3d at 1311 (noting the extent-of-injury-factor is not dispositive of the analysis). Defendants did not hit, kick, or otherwise use additional force against Plaintiff after they "slammed" him to the ground, and they picked Plaintiff back up after warning him to discontinue his conduct. These facts, in consideration of the circumstances, permit the inference Defendants were motivated by a good faith effort to restore order, not to inflict pain. Cf., e.g., Sanks v. Williams, 402 F. App'x 409, 412 (11th Cir. 2010) (reasoning the officer demonstrated he was acting in good faith in part by ceasing to use force when the prisoner stopped resisting).

Plaintiff faults Defendant Geiger or Mohs for misplacing the spit shield, which made it difficult for him to breathe. Defendant Geiger, who placed the spit shield over Plaintiff's head, concedes he misplaced it. See Def. Ex. I ¶ 3. Defendant Geiger avers as follows: "[D]ue to a pre-existing laceration on [Plaintiff's] forehead and his combative behavior, I was not able to place the spit shield properly." Id. See also Def. Ex. G ¶ 3 ("[T]he spit shield could not be placed properly."). The misuse of the spit shield was reported to superiors after

the incident. <u>See</u> Def. Ex. B at 1. Colonel J. Schweinsberg, who reviewed the use-of-force incident, noted in the incident report, "The spit shield was not properly utilized." <u>Id.</u> Colonel Schweinsberg indicated he would "hold training at [the] next OIC meeting." <u>Id.</u> Warden Rossiter also reviewed the incident and noted, "[t]he issue with the spit shield was addressed by Colonel Schweinsberg." <u>Id.</u>

Other than his own self-serving, conclusory, and speculative assertions that Defendant Geiger intentionally or maliciously misplaced the spit shield, <u>see</u> Pl. Dec. ¶ 8; Compl. at 10, Plaintiff offers no evidence permitting the inference Defendant Geiger's conduct was anything more than negligent. Speculation and bald conclusions are insufficient to overcome summary judgment. <u>See</u> <u>Peppers v. Coates</u>, 887 F.2d 1493, 1498 (11th Cir. 1989) ("If the [non-moving] party's response consists of nothing more than a repetition of his conclusory allegations, the district court must enter summary judgment in the moving party's favor.").

Finally, liberally construing Plaintiff's allegations, he suggests Defendants Geiger and Mohs were deliberately indifferent to his health or safety by refusing to fix the spit shield so he could breathe better. <u>See</u> Compl. at 10-11. Defendants Geiger and Mohs dispute that they did nothing to address Plaintiff's complaints about the spit shield. In their affidavits, Defendants aver

they "readjusted [the] spit shield" after they brought Plaintiff to the ground. See Def. Ex. G ¶ 3; Def. Ex. I ¶ 3. In his declaration, Plaintiff contends Defendants never "attempted to fix [the spit shield]." See Pl. Dec. ¶ 9.

When Defendants Geiger and Mohs forced Plaintiff to the ground, the camera operator was standing behind them, so, if they adjusted the spit shield at that time, it was not captured on video. See Def. Ex. O. However, each Defendant Geiger and Mohs, at different times, attempted to adjust the spit shield when they were walking to the medical unit after picking Plaintiff up off the ground. Id. At roughly 1:24:00, Defendants stopped walking, and Defendant Geiger tried to adjust the spit shield. Id. They stopped again at 1:40:00, and Defendant Mohs then tried to adjust the spit shield. Id. That Defendants each attempted to adjust the spit shield suggests they were not deliberately indifferent to the problem. See Farmer v. Brennan, 511 U.S. 825, 835 (1994) ("[D]eliberate indifference describes a state of mind more blameworthy than negligence."). See also McElligott v. Foley, 182 F.3d 1248, 1255 (11th Cir. 1999) ("[A] plaintiff [must] show more than mere negligence to establish a violation of the Eighth Amendment [to] defeat a prison official's motion for summary judgment.").

Defendants Geiger and Mohs are entitled to qualified immunity because Plaintiff fails to point to evidence that shows they violated a constitutional right.

## C. Supervisory Claim: Defendant Rossiter

Because the officer-Defendants are entitled to qualified immunity, the supervisory liability claim against Defendant Rossiter necessarily fails. "There can be no policy-based liability or supervisory liability when there is no underlying constitutional violation." Knight through Kerr v. Miami-Dade Cnty., 856 F.3d 795, 821 (11th Cir. 2017). See also Gish v. Thomas, 516 F.3d 952, 955 (11th Cir. 2008) ("Without an underlying violation of [the plaintiff's] constitutional rights, [the sheriff] cannot be liable in his individual or official capacity for a failure to train [the officer,] and [the county] cannot be liable on the ground that its policy caused a constitutional violation."); Hicks v. Moore, 422 F.3d 1246, 1253 (11th Cir. 2005) (holding the plaintiff could not maintain a supervisory liability action under § 1983 because there was no underlying constitutional violation by the officers).

## D. Supplemental Jurisdiction

With Defendants entitled to summary judgment on the federal claims, that leaves the state-law claims. See Compl. at 3. Generally, state courts should decide matters of state law. See United Mine Workers of Am. v. Gibbs,

383 U.S. 715, 726-27 (1966) (identifying factors district courts should consider in deciding whether to exercise supplemental jurisdiction over remaining state-law claims when the federal claims are subject to dismissal). As such, the Eleventh Circuit has "encouraged district courts to dismiss any remaining state claims when . . . the federal claims have been dismissed prior to trial." Raney v. Allstate Ins. Co., 370 F.3d 1086, 1089 (11th Cir. 2004). See also 28 U.S.C. § 1367(c)(3) ("[D]istrict courts may decline to exercise supplemental jurisdiction over [state claims] if . . . the district court has dismissed all claims over which it has original jurisdiction.").

Upon review and in consideration of the relevant factors, the Court declines to exercise supplemental jurisdiction over the pendent state-law claims and will dismiss those without prejudice subject to Plaintiff's right to pursue them in state court if he so chooses.[8]

Accordingly, it is

**ORDERED:**

1.    Defendants' motion for summary judgment (Doc. 66) is **GRANTED in part** to the extent they are entitled to judgment in their favor on the federal claims arising under § 1983.

2.    Plaintiff's state-law claims are **dismissed without prejudice**.

---

[8] Plaintiff's state claims have not become time barred.

3.   The **Clerk** shall enter judgment in favor of Defendants, terminate any pending motions as moot, and close the case.

**DONE AND ORDERED** at Jacksonville, Florida, this 10th day of May 2021.

_Brian J. Davis_

BRIAN J. DAVIS
United States District Judge

Jax-6
c:   Alfredo Roca-Moreno
     Counsel of Record